UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| | ) | |
| v. | ) | Case No. 4:10-CR-24 |
| | ) | MATTICE/CARTER |
| | ) | |
| DANIEL DILG | ) | |

REPORT AND RECOMMENDATION

I. Introduction

The undersigned is asked to consider the admissibility of a statement given by defendant Daniel Dilg to law enforcement on November 3, 2009 concerning a fire at his home on October 24, 2009. Defendant asserts police coerced him to come to the police station alone, he was not allowed access to his attorney despite his requests, and police coerced him into signing a "confession" which he could not read and did not know what it contained. I do not find the defendant credible, however, and RECOMMEND that defendant's motion to suppress the November 3, 2009 statement be DENIED.

II. Relevant Facts

The evidentiary hearing on defendant's motion to suppress was held over two days, June 1, 2011 and June 22, 2011. Six witnesses, including the defendant, testified.

*Craig Frost*

Craig Frost testified to the following: he has eleven years experience in law enforcement. Since 2009, he has been assigned to the Tennessee Bomb and Arson Department. He is a

1

certified arson investigator, and he is currently also assigned to the 10th Judicial District ATF/Drug Task Force.

On October 24, 2009, he received a call to go to the defendant's house in Tracy City, Tennessee to identify the cause of a house fire which had just occurred there. He was informed someone had died in the house and the body was still there. When he arrived at the scene, the defendant was present and stated the home belonged to him. Frost explained he was investigating the fire and interviewed the defendant. The defendant also signed a consent form to permit law enforcement to search the house. The defendant was not under arrest. After the interview, the defendant left to go to a hotel. Frost obtained a telephone number to contact the defendant later if needed. During the search, law enforcement found evidence of methamphetamine manufacturing inside the house.

Shortly after October 24, 2009, defendant spoke with other officers, and Frost learned about those conversations, but he was not present. Later on November 3, 2009, at the request of the Sheriff of Grundy County, Tennessee, Sheriff Brent Myers, defendant went to the Grundy County Sheriff's Department to answer more questions about the fire at his house. Sheriff Myers, Grundy County Chief Deputy Lonnie Cleek, Frost, and the defendant were all present in an office during the interview. Defendant was not under arrest, and he was not placed in handcuffs. Frost explained to defendant that they wanted more detail about the house fire, and Dilg agreed to talk to them.

Frost testified that before defendant gave his statement, Frost read the defendant his *Miranda* rights from a form he obtained from the Tennessee Bomb and Arson Department. At the bottom of the waiver of rights form is a blank for date and a blank for time. The waiver form

is dated 11/3/09 and the time is recorded as 5:45 pm. This information in hadwritten in the blanks. Defendant initialed the form twice to indicate he had read his rights and understood them. He also signed the waiver form. Frost and Cleek signed the waiver form as witnesses. Frost also asked defendant if he understood his rights and defendant said he did. At no time did Dilg say he had a lawyer or state he did not want to make a statement. Nor did Dilg ever inform law enforcement that he could not read the waiver form or statement because he did not have his glasses.

After waiving his *Miranda* rights, law enforcement asked defendant questions, and he answered them. The interview lasted at least an hour, and Frost wrote out by hand defendant's statement on lined paper. (Gov. Ex. D). When they were finished, Frost read the statement to Dilg, let Dilg read the statement himself, and then asked Dilg if he wanted to make any changes. Dilg responded he did not. Then Frost asked defendant to initial each paragraph of the statement to indicate he agreed with it. Dilg complied. Dilg also signed the statement at the end. The statement is dated 11-3-09 at the bottom. Frost signed the statement underneath Dilg's signature. Frost did not know who wrote out the heading at the top of the statement. After completion of the interview, Dilg left without assistance from law enforcement.

The statement is slightly over two handwritten pages long. It is incriminating in that defendant admits to involvement in methamphetamine manufacturing at his home which resulted in a fire. At the top of the statement there is a handwritten heading consisting of the following: "Interview w/ Daniel Lee Dilg." The heading also includes the date, "11/3/09" and a time, "5:40 P.M." Frost testified that while he wrote down Dilg's statement, he did not write this heading which included the time. He also testified that he thought the heading was prepared prior to the

3

commencement of the interview. While the waiver of rights form has the time 5:45 pm and the statement has the time 5:40 pm, Frost was adamant that Dilg was given and waived his *Miranda* rights *before* he was interviewed and gave his statement.

### *Daniel L. Dilg*

Daniel L. Dilg, the defendant in this case, testified as follows: He gave law enforcement three statements concerning the fire at his house on October 24, 2009: first, at his home immediately after the fire was extinguished; second, at the Tracy City, Tennessee Police Department on October 26, 2009; and third, at the Grundy County Sheriff's Department on November 3, 2009. During the first two interviews, he was not represented by counsel and did not ask to be represented by counsel, but he was accompanied by his daughter and son-in-law. At the time of the third interview, November 3, 2009, he had already retained attorney Brian O'Shaughnessy to represent him in this matter. According to defendant, Sheriff Myers telephoned him while he was staying with his brother in Chattanooga, Tennessee. He had left Grundy County because Sheriff Myers had told him during the October 26, 2009 interview to stay away until the investigation was completed. Myers told defendant to come to the Sheriff's Department November 3, 2009 for another interview. Dilg told Myers he had hired Attorney O'Shaughnessy and he did not want to answer any questions without him present. Myers told him to come to the Sheriff's Department now or he would be arrested. Myers also told him not to bring his daughter and son-in-law with him. Dilg tried unsuccessfully to reach O'Shaughnessy and then went to the Sheriff's Department.

At the Sheriff's Department defendant he told Frost and Cleek he wanted O'Shaughnessy, his attorney, to be present during questioning. They told him he did not need an attorney, he

wasn't in trouble and wasn't going to be arrested, they just wanted information about the fire. Myers was not present during this interview.

During the suppression hearing, Dilg testified that on November 3, 2009, he was handed some papers with writing on it that he could not read because his glasses were destroyed in the fire. No-one read the contents of the papers to him. He initialed the papers and signed where he was told to do so. At the suppression hearing, defendant had new glasses and testified he was not familiar with the November 3, 2009 statement, (Gov. Ex. D), since he had been unable to read it on November 3, 2009. He firmly disavowed that the statement dated November 3, 2009 was a statement that he gave to law enforcement. He also testified he does not remember signing the waiver of rights form but the signature on the waiver form could be his.

Dilg testified that while he was never put in police custody, booked, fingerprinted, handcuffed, or incarcerated on November 3, 2009, he did not voluntarily come to the Grundy County Sheriff's Department on that date. He only came because Sheriff Myers told him if he did not come he would be arrested.

Dilg further testified that Brian O'Shaughnessy had been his court appointed attorney in a prior, unrelated matter which had concluded before the October 24, 2006 fire at his house. He hired O'Shaughnessy a day or two after the October 26, 2009 interview for the purpose of representing him in regards to the October 24, 2009 fire. At that time, he gave O'Shaughnessy money, but he does not remember whether he signed a contract for O'Shaughnessy to represent him.

*Lonnie Cleek*

At all times at issue in this motion to suppression, Lonnie Cleek was the Grundy County

5

Sheriff's Chief Deputy. He was involved in the investigation of the October 24, 2009 house fire at defendant's home which resulted in one person's death. He has spoken with the defendant multiple times about this fire. At no time was defendant ever put in police custody, handcuffed, or not allowed to leave of his own accord. At the suppression hearing, Cleek identified Gov. Ex. E as the statement defendant gave law enforcement on October 26, 2009. The statement is about one quarter page long and was handwritten by the defendant.

Sometime after the October 26, 2009 statement and before the November 3, 2009 statement, Cleek called the defendant and told him they wanted to talk to him again. Dilg told Cleek he had hired attorney Brian O'Shaughnessy. Cleek then called O'Shaughnessy, but O'Shaughnessy told Cleek that while he had talked to Dilg, Dilg had not retained him. After this conversation, Cleek called defendant's daughter and told her what O'Shaughnessy had said. He made arrangements then to meet again with Dilg. He never threatened to arrest Dilg if Dilg did not come in to give another statement. He made no threats at all to Dilg if Dilg refused to talk to him again.

Cleek was part of the November 3, 20009 interview. Defendant was first given his *Miranda* rights and defendant signed the waiver form before he gave his statement. Cleek did not know why the waiver of rights form (Gov. Ex. C) has a time of 5:40 pm and the statement (Gov. Ex. D) has a time of 5:40, but he thought it might be because the clocks relied upon by the persons who filled in the times were not synchronized. The interview lasted over 30 minutes. He wrote out the heading, including the time of 5: 40 pm., found on the top section of the November 3, 2009 statement. He did not write out the defendant's statement. Frost wrote down defendant's statement on November 3, 2009.

### *Sheriff Brent Myers*

Sheriff Myers testified to the following: At all time relevant to this motion to suppress, Brent Myers was the Sheriff of Grundy County. During the course of his investigation of the October 24, 2009 house fire that resulted in one person's death, he spoke several times to Daniel Dilg. He never threatened to arrest Dilg if he did not talk to him. Myers was part of the October 24 and October 26, 2009 interviews, but he was not present during the November 3, 2009 interview. He has never telephone Dilg.

### *Tim King*

Mr. King testified as follows. Daniel Dilg is his wife's step-father. He drove defendant to the October 26, 2009 interview at the Tracy City Police Department. During the interview, King was in and out of the office. Sheriff Myers was present, and King did not hear Myers say anything about methamphetamine. He does not know whether defendant hired Attorney O'Shaughnessy. He does not know whether defendant needs glasses.

### *Brian O'Shaughnessy*

Mr. O'Shaughnessy is an attorney practicing law in Chattanooga, Tennessee. He testified at the suppression hearing as follows: Often a prospective client will call him to talk about representation, but until he is paid a retainer fee, he has not been retained as counsel for that person. In this instance, he recalls Dilg phoning him because Dilg was concerned he had been or was going to be charged with murder in relation to the fire at his house. Dilg hired him to learn if he was facing a murder charge and to be present with him if law enforcement wanted to interview him. A couple of times in the past someone from law enforcement has called him (O'Shaughnessy) to ask if he represents a certain person but that has been a very rare occurrence.

7

He does not recall that Cleek ever called him. He also does not recall that the defendant ever complained about being forced to sign a statement without him (O'Shaughnessy) present. During the suppression hearing, O'Shaughnessy could not recall when defendant hired him but stated he could determine the date of hire by reviewing his financial records to see when Dilg paid him. After the suppression hearing, O'Shaughnessy submitted an affidavit in which he stated Mr. Dilg retained him in February 2010. (O'Shaughnessy Affidavit, Doc. 88).

### III. Discussion

Defendant Dilg contends that the November 3, 2009 statement should be suppressed because 1) he was represented by an attorney on November 3, 2009 and taking the statement outside the presence of his attorney violated his Sixth Amendment rights, 2) he was not given his *Miranda* rights before his statement was taken, in violation of his Fifth Amendment rights, and 3) the November 3, 2009 statement was not given voluntarily and knowingly, in violation of his Fifth Amendment rights.

*Defendant's Sixth Amendment Right to Counsel*

The Sixth Amendment right to counsel does not attach until the initiation of adversary judicial proceedings. *United States v. Gouveia,* 467 U.S. 180, 187-88 (1984); *United States v. Fowler*, 535 F.3d 408, 416 (6th Cir. 2008). At the time the November 3, 2009 statement was taken, there were no adversarial judicial proceedings pending against the defendant. Thus no Sixth Amendment right could have been violated.

*Defendant's Fifth Amendment Rights*

Defendant asserts his Fifth Amendment rights were violated because he was not given his

8

*Miranda* rights before he was interviewed on November 3, 2009, and because he was coerced into coming to the station to give a statement and the statement he allegedly gave was not knowingly and intelligently given since he did not, in fact, give the statement.

The Fifth Amendment requires *Miranda* warnings be given only when the defendant is in custody during questioning. *Dickerson v. United States*, 530 U.S. 428 (2000); *Miranda v. Arizona*, 384 U.S. 436 (1966). The test for determining when a detention has occurred for purposes of the Fourth Amendment and when a custodial detention has occurred for purposes of the Fifth Amendment are not the same. *Berkemer v. McCarty*, 468 U.S. 420, 436-441 (1984); *United States v. Salvo*, 133 F.3d 943, 949 (6th Cir. 1998); *United States v. Knox*, 839 F.2d 285, 289-291 (6th Cir. 1988). The test for determining whether a seizure has occurred under the Fourth Amendment is whether a reasonable person in the defendant's position would have felt free to leave, given the totality of the circumstances. For Fifth Amendment purposes, however, "the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam); *see also Miranda v. Arizona*, 384 U.S. 436, 444 (1966) (custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."); *United States v. Panak,* 552 F.3d 462, 465 (6th Cir. 2009) (same); United *States v. Crossley*, 224 F.3d 847, 861 (6th Cir. 2000) (same). Thus, it is possible for a person to be detained but not in custody for purposes of requiring *Miranda* rights. *Berkemer*, 468 U.S. at 427.

In the instant case, the defendant was not in custody at the Grundy County Sheriff's Department on November 3, 2009 for Fifth Amendment purposes. While the defendant asserts

9

he was coerced into coming to the Grundy Sheriff's Department under threat of arrest even though he told law enforcement he was represented by Brian O'Shaughnessy, I do not find the defendant to be credible. I carefully observed the defendant's demeanor during the suppression hearing, and I am convinced the defendant believes he can talk his way out of any trouble. Defendant's primary argument is that he repeatedly told law enforcement on November 3, 2009 he did not want to talk to them unless his attorney, Brian O'Shaughnessy, was present. Defendant was adamant he hired O'Shaughnessy and gave him money a few days after he gave his second statement on October 26, 2009 and *before* November 3, 2009. However, according to O'Shaughnessy's records, he was not hired by the defendant to represent the defendant until February 2010, at least two month *after* November 3, 2009. Consequently, I do not believe defendant's assertion that he told law enforcement on November 3, 2009 that he would not come to the Sheriff's Department without his attorney. Rather, I conclude defendant went to the Sheriff's Department willingly, absent any threat of arrest, in order to talk to law enforcement, as he had done twice before, to convince them he was not materially involved in the October 24, 2009 fire that occurred at his house. Once there, he was not handcuffed, locked up, or treated in any way as though he were under arrest. Consequently, law enforcement was not required to give defendant *Miranda* warnings.

Further, even if defendant was in custody on November 3, 2009 at the time he gave his statement, I find he was given his *Miranda* warnings before he gave his statement, and he did voluntarily and knowingly waive his *Miranda* rights. *See United States v. Montgomery*, 621 U.S. F.3d 568, 573 (6th Cir. 2010) ("To be valid, waivers of Fifth Amendment rights must be 'voluntarily, knowingly and intelligently' made") (quoting *Miranda v. Arizona*, 384 U.S. 436,

444 (1966)); *see also Missouri v. Seibert*, 542 U.S. 600, 608-09 (2004)( The Fifth Amendment requires that a statement or confession be voluntarily, knowingly, and intelligently given to be admitted into evidence); *accord Dickerson*, 530 U.S. at 433; *United States v. Montgomery*, 621 F.3d 568, 573 (6th Cir. 2010). The government bears the burden to prove by a preponderance of the evidence that the confession or statements were voluntarily, knowingly, and intelligently given. *Seibert*, 542 U.S. at 608 n. 1; *United States v. Ostranda*, 411 F.3d 684, 696 (2005; *United States v. Wrice*, 954 F.2d 406, 410 (6th Cir.).

Whether a confession was voluntarily given requires inquiry into "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." *Dickerson*, 530 U.S. at 434 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 223 (1973)). In making this inquiry, the court must consider the totality of the circumstances, "both the characteristics of the accused and the details of the interrogation." *Dickerson*, 530 U.S. at 434 (internal citations omitted). "The determination 'depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing.'" *Dickerson*, 530 U.S. at 434 (brackets original) (quoting *Stein v. New York*, 346 U.S. 156, 185 (1953)). Factors to consider may include:

> (1) police coercion; (2) length of interrogation; (3) location of interrogation; (4) continuity of interrogation; (5) the suspect's maturity; (6) the suspect's education; (7) the suspect's physical condition and mental health; and (8) whether the suspect was advised of Miranda rights. *Withrow v. Williams*, 507 U.S. 680, 693-94 (1993).

*Abela v. Martin*, 380 F.3d 915, 928 (6th Cir. 2004). "Coercive police activity is a necessary element for finding that a confession was involuntary." *Abela*, 380 F.3d at 928 (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). Promises of leniency and threats of prosecution may also be forms of coercion which overbear an accused's will and render a confession or statement

11

involuntary. *United States v. Johnson*, 351 F.3d 254, 261 (6th Cir. 2003); *Wrice*, 954 F.2d at 411.

In the instant case, the waiver of rights form (Gov. Ex. C) has a time written on it of 5:45 pm. The time of 5:40 pm is written on the statement (Gov. Ex. D) in the handwritten header at the top of the lined paper. Defendant argues these times support his assertion that he was not given *Miranda* warnings before he was interviewed by law enforcement. Frost and Cleek, on the other hand, are adamant that they gave defendant his *Miranda* warnings before defendant's statement was taken. I credit their testimony. Cleek testified he wrote the heading, including the time of 5:40 pm, on the paper used to take defendant's statement, in preparation for the interview to begin. I conclude this was done either immediately before or at the very beginning of the meeting with defendant. Frost then read defendant his rights from the waiver of rights form and discussed them with defendant. This took a few minutes. After doing so, the waiver form was signed, dated, and Frost recorded the time of 5:45 p.m. Then the interview began, and Frost wrote out defendant's statement on the lined paper with the heading which included the time of 5:40 p.m. If the waiver form had not been completed until *after* defendant gave his statement, then the waiver form would have had a time of at least 6:10 p.m. since the interview lasted at least 30 minutes.[1] I conclude that Frost and Cleek testified honestly and accurately that Dilg signed the waiver form *before* he gave his statement.

Defendant asserts he was coerced to come to the police station by the threat that if he did not come, he would be arrested. As previously discussed, the undersigned does not find this allegation credible. Defendant also asserts he could not read the waiver form or the statement because he cannot read without his glasses and his glasses had been destroyed in the fire and not

---

[1]Law enforcement are urged to be more careful in the future to avoid this same confusion.

12

yet replaced on November 3, 2009. However, the Court notes defendant's son-in-law, Tim King, testified he did not know if defendant needed glasses. Further, even though defendant had a pair of reading glasses at the hearing, the undersigned saw the defendant intently looking over the exhibits to the hearing without using his glasses. I do not credit defendant's contention that he could not read the waiver form or statement because he had no glasses.

I also make these further finding: Cleek and Frost credibly testified defendant's *Miranda* rights were read to defendant and defendant said he understood them. Defendant also read the waiver of rights form and initialed and signed the form to indicate he understood and was waiving those rights. The November 3, 2009 interview lasted about an hour; defendant was not handcuffed or told he could not leave. He was not threatened and no promises of leniency were made. Defendant had had previous involvement with law enforcement and was familiar with his rights. The undersigned observed from defendant's conduct during his testimony at the suppression hearing that defendant is articulate and unintimidated by the legal process. At no time did the defendant say he would not talk to law enforcement without his attorney or ask that the interview stop. Defendant answered their questions willingly, and Frost accurately wrote down what defendant told him. I conclude defendant voluntarily and knowingly waived his Fifth Amendment rights and gave his statement, as set forth in Gov. Ex D., to law enforcement on November 3, 2009. Accordingly, I conclude there is no basis to suppress defendant's statement given on November 3, 2009, and it is RECOMMENDED defendant's motion to suppress be DENIED.

s/William B. Mitchell Carter  
UNITED STATES MAGISTRATE JUDGE

13

Case 4:10-cr-00024-CLC-CHS Document 90 Filed 07/22/11 Page 13 of 13 PageID #: 278